IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ROY WIRTZ, ERIC BROWN, PETER REIMERS, and TIM DELANEY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:11-cv-325-RLM-CAN |
| CITY OF SOUTH BEND, INDIANA, | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>

### INTRODUCTION

On June 27, 2011, the South Bend Common Council passed Ordinance No. 10099-11 ("the Ordinance"), which was signed by the Mayor the following day.  Among other things, this Ordinance appropriated $1.2 million in taxpayer monies for the purchase of a property in South Bend, Indiana, that at the time was a fully functional "Family Dollar" store.  The sole reason for the purchase of this property by South Bend ("the City") was so that the property could be transferred for one dollar ($1.00) to the Catholic Diocese of Ft. Wayne-South Bend ("the Diocese").  The Diocese owns and operates St. Joseph's High School ("the school"), a private parochial school that teaches and adheres to the Catholic faith, which is currently in the process of constructing a campus in downtown South Bend.  Once transferred, the property will be used as a portion of the school's athletic complex.

That transfer is now imminent and, once it occurs, the plaintiff-taxpayers may have no recourse for ensuring that the City does not misuse their tax funds in a manner that violates the state and federal constitutions.  The planned transfer is not neutral between religions, or between

1

religion and non-religion.  It constitutes substantial, direct aid to a religious institution, and the City has obtained no assurances that the property will not be used toward religious ends— indeed, it is highly likely that it *will* be used for these purposes.  As such, this transaction is violative of the Establishment Clause of the First Amendment of the United States Constitution, as well as Sections 4 and 6 of Article 1 of the Indiana Constitution.  All requirements for the issuance of a preliminary injunction are met in this case, and one should issue without bond.

STATEMENT OF FACTS

It is anticipated that the following facts will be adduced during the preliminary injunction hearing in this cause:

*Facts Regarding the Transfer of Property*

The City of South Bend, Indiana ("City"), is a municipality located in St. Joseph County, Indiana.  Its legislative affairs are conducted through a nine-member Common Council.  On or about June 27, 2011, the Common Council passed Ordinance No. 10099-11 ("the Ordinance"), which was signed by the Mayor the following day.  Among other things, this Ordinance allocated approximately $1.2 million from the City's economic development income tax fund (established pursuant to Indiana Code § 6-3.5-7-13.1) for the purchase of a "Family Dollar" store within the City ("the property").

Following the purchase of this property, which has now been completed, the City intends to transfer the property, for one dollar ($1.00), to the Catholic Diocese that oversees St. Joseph's High School ("the school") for the construction of part of a football stadium (or at least part of the school's athletic complex).  Prior to construction of the stadium, the "Family Dollar" store will be demolished by either the City or the Diocese.  The City has not placed the property, and does not intend to place the property, on the open market or attempted to sell the property to the

2

highest bidder.  It has not solicited (and will not solicit) bids for the property or concerning the use thereof.  And, the value of the property far exceeds the one dollar ($1.00) that the Diocese will pay the City for the property.

Following the transfer of the property, the Diocese intends to permit the use of the football stadium by the City or by public schools in South Bend, although this use will be limited to unspecified days and times when the field is not being used by the school or its athletic teams. Moreover, the Diocese may charge the City, the public schools, and/or the public for the use of the stadium or other facilities.  The City has not restricted and will not restrict the Diocese from using the transferred property for religious activities and/or purposes.  The City has not made and does not intend to make any transfers of similar properties in its possession to other public or private schools, but has instead made the discretionary decision to provide this special benefit solely to the school.

St. Joseph's High School is a private Catholic high school within the City and, as such, is operated and overseen by the Catholic Diocese.  According to the school's website, its Mission Statement reads as follows:

> Saint Joseph's High School is a Catholic secondary school dedicated to transforming students in heart and mind, preparing them to serve God, the Church and the world.

*See* Saint Joseph's High School, Statements of Mission and Vision, http://www.stjoe.k12. in.us/Information/mission_and_beliefs.jsp (last visited Aug. 3, 2011).  Its Vision Statement includes, in part, the school's belief "that every member of the Saint Joseph's High School community . . . [p]ractices faith in God." *Id.*  Accordingly, among other things, the school requires all students to receive a Catholic education and to complete specified credit hours in theology.

3

Moreover, even the athletic and other extra-curricular events in which the school participates contain sectarian, religious elements. For instance, according to the Saint Joseph's High School Student-Parent Handbook for 2011–2012,

> [a]ll [school athletic] practices and competitions should be preceded and/or concluded by a prayer led by the administrator, team coach, function leader, activity sponsor, or designated participant, whatever the case may be. The prayer selected by the responsible individual shall be consistent with the teachings and traditions of the Catholic Church. If the school-sponsored event is attended by the school chaplain or other priest, it is appropriate to ask the priest to lead the students in prayer.
>
> *        *        *
>
> Coaches are also encouraged to arrange for a prayer service or Mass before games and activities, when feasible.

These "practices and competitions" include events, such as football games and practices, that will occur on the property.

*Facts Concerning the Plaintiffs*

The plaintiffs are all adult residents of South Bend and St. Joseph County, Indiana. They have paid, pay, and will continue to pay municipal taxes both to the City and to St. Joseph County. These taxes have, do, and will take the form of income taxes and property taxes. Among the taxes that they have paid and will continue to pay are county economic development income taxes, which are paid to St. Joseph County and then distributed into the City's economic development income tax fund. These taxes have been and will be used to pay for the property and/or the transfer thereof (and/or preparations for the transfer). *See* IND. CODE §§ 6-3.5-7-5, 6-3.5-7-12, 6-3.5-7-13.1. All plaintiffs have paid county economic development income taxes to St. Joseph County for at least the past several years.

The plaintiffs all object to the use of their taxes to benefit a religious institution such as the Catholic Diocese and/or the school, and they do not want their taxes to be utilized for this purpose.

### PRELIMINARY INJUNCTION STANDARD

The standard in the Seventh Circuit for the granting of a preliminary injunction is clear. In order to determine whether a preliminary injunction should be granted, the Court weighs several factors:

(1) whether the plaintiffs have established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiffs' remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3) whether the threatened injury to the plaintiffs outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

(4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g.*, *Baja Contractor, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987).  The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it."  *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).  After weighing these factors, it is clear that a preliminary injunction should issue in this case.

### ARGUMENT

## Likelihood of Success on the Merits

I.    THE PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS FOR VIOLATIONS OF THE STATE AND FEDERAL CONSTITUTIONS RESULTING FROM THE IMMINENT TRANSFER OF CITY PROPERTY TO THE CATHOLIC DIOCESE.[1]

   A.  *Municipal Taxpayer Standing to Enforce the Establishment Clause*

      As specified in greater detail above, the taxpayer-plaintiffs in this case have all paid income taxes that have been used for the allegedly unconstitutional transaction at issue.  While the scope of taxpayer injury recognized under the doctrine of *federal* taxpayer standing is relatively narrow, *see, e.g.*, *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587 (2007), the scope of taxpayer injury recognized under the doctrine of *municipal* taxpayer standing is broad, *see, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006).  The Supreme Court has articulated the "very different" interest possessed by federal and municipal taxpayers in this manner:

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. . . .  The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation.

*Frothingham v. Mellon*, 262 U.S. 447, 486–87 (1923); *see also Hinrichs v. Speaker*, 506 F.3d 584, 591–92 (7th Cir. 2007).  While a "federal taxpayer's 'interest in the moneys of the treasury . . . is comparatively minute and indeterminable,'" *Flast v. Cohen*, 392 U.S. 83, 92–93 (1968) (quoting *Frothingham*, 262 U.S. at 486–87), the same is not true of a municipal taxpayer's interest.

      Accordingly, when it comes to municipal taxpayer standing, courts are in agreement that when a "municipal taxpayer can establish that the challenged activity involves a measurable

---

[1] It is unclear at this point whether the City will contend that standing is lacking in this case.  However, given that standing is a jurisdictional issue and given the abbreviated time-frame with which the plaintiffs are requesting that these issues be resolved, the issue is addressed herein.

appropriation or loss of revenue, the injury requirement [for standing] is satisfied." *District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 5 (D.C. Cir. 1988); *accord Gonzales v. N. Twp. of Lake County*, 4 F.3d 1412, 1416 (7th Cir. 1993) (noting that, to establish standing, municipal taxpayers need only challenge "tax dollar expenditures that allegedly contribute to Establishment Clause violations"). The injury in such cases is simply the "misuse of public funds," which includes transfers or leases of governmental property for less than fair market value. *Common Cause*, 4 F.3d at 5, 7 (citing *Hawley v. City of Cleveland*, 773 F.2d 736, 741–42 (6th Cir. 1985), *Annunziato v. New Haven Board of Aldermen*, 555 F.Supp. 427, 431 (D. Conn. 1982), and *Ridgefield Women's Political Caucus, Inc. v. Fossi*, 458 F.Supp. 117, 120 n.3 (D. Conn. 1978)).

The plaintiffs' allegations in the present case clearly satisfy this test. The City has expended $1.2 million worth of taxpayer funds to acquire a parcel of land for that amount, which it intends to unconstitutionally transfer for a nominal fee to the Catholic Diocese. Standing exists.[2]

### B. *Public Standing Doctrine to Enforce the Indiana Constitution*

The Indiana Supreme Court has also recognized a similar doctrine of standing premised on plaintiffs' status as taxpayers, which is relevant for the plaintiffs' state constitutional claims in the case at bar. As that court made clear in *Embry v. O'Bannon*, 798 N.E.2d 157 (Ind. 2003), the so-called "public standing doctrine" has been "recognized in Indiana case law for more than one hundred and fifty years and remains viable today." *Id.* at 160. Under this doctrine, taxpayer-

---

[2] In addition to demonstrating an injury-in-fact, taxpayer plaintiffs must, of course, demonstrate that the constitutional injury may fairly be traced to the challenged action (causation) and that the requested relief will redress the alleged injury (redressability). *E.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998). The plaintiffs' allegations clearly meet these prongs of the standing inquiry as well: the constitutional injury is the misuse of public funds, which has been caused by the challenged transaction, and it is redressable by an order preventing the proposed transfer of the property to the Catholic Diocese.

plaintiffs have a right to pursue an action "grounded . . . on their shared public interest as taxpayers in the allegedly unconstitutional expenditure of public funds." *Id.*  As it relates to the plaintiffs' standing to challenge the transaction under the Indiana Constitution, this case is indistinguishable from *Embry*.  The same injury permitting the plaintiffs to pursue their federal constitutional claims also permits them to pursue their state constitutional claims.

II.  THE PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ON THEIR CLAIM THAT THE CITY'S ACQUISITION OF THE PROPERTY AND SUBSEQUENT TRANSFER TO THE CATHOLIC DIOCESE VIOLATES THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT.

   *A.  Background to Establishment Clause Analysis*

The First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion."   U.S. CONST. amend. I.   This provision, among other things, "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'"   *County of Allegheny v. ACLU*, 492 U.S. 573, 594 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)).  In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court established a three-part test to determine whether governmental action runs afoul of the Establishment Clause: in order to pass constitutional muster, (a) the action must have a secular purpose, (b) the action must have a principal or primary effect that neither advances nor inhibits religion, and (c) the action must not foster excessive governmental entanglement with religion.  *Id.* at 612–13; *see also, e.g.*, *Agostini v. Felton*, 521 U.S. 203 (1997).

The so-called *Lemon* test has been subjected to much criticism by Members of the Supreme Court and, as this internal criticism has mounted, a number of cases have redefined the

first two (2) prongs under an "endorsement" test.  *See, e.g.*, *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995); *County of Allegheny*, *supra*; *Cohen v. City of Des Plaines*, 8 F.3d 484 (7th Cir. 1993).  Thus, in *Freedom from Religion Foundation v. City of Marshfield*, 203 F.3d 487 (7th Cir. 2000), the Seventh Circuit noted as follows:

> Following the Court's formal acceptance in *County of Allegheny*, the effect prong of th[e *Lemon*] test has been analyzed under the "perception of endorsement" test developed in *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring).  Under this test, the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.  When [a court] find[s] that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is *favored* or *preferred*, the Establishment Clause has been violated.

*Id.* at 493 (selected quotations and citations omitted).  However, despite certain misgivings by a number of the Justices, the Supreme Court has continued to hold that *Lemon* remains alive and viable.  *See, e.g.*, *McCreary County v. ACLU*, 545 U.S. 844, 859 (2005); *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 507 (7th Cir. 2010).

Under the rubric of any test, the transaction at issue in this case—which constitutes nothing less than a $1.2 million gift from a municipality to a church (minus a dollar)—is unconstitutional.

> B.  *The transaction at issue in this case violates the requirement of neutrality central to the Establishment Clause.*

Regardless of the precise nomenclature assigned to the Court's Establishment Clause jurisprudence, the Court has repeatedly cautioned that a "central Establishment Clause value" is that the Constitution "mandates governmental neutrality between religion and religion, and between religion and nonreligion."  *McCreary County*, 545 U.S. at 860 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)); *see also Mitchell v. Helms*, 530 U.S. 793, 845–46 (2000)

(O'Connor, J., concurring) (controlling opinion[3]) (reaffirming that governmental aid must be "allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion"); *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). In this case, intense scrutiny into the application of the *Lemon* test is unnecessary, for the transaction at issue does not comport with this fundamental tenet of neutrality and, for this reason alone, constitutes an illicit endorsement of religion.

In applying this tenet, the Supreme Court has repeatedly invalidated governmental programs or actions that provide special benefits to specific religious entities. For instance, in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989), the Court held unconstitutional a statute that gave a tax exemption to religious periodicals but not to comparable secular periodicals. And in *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), the Court likewise struck down the creation of a school district matching the boundaries of a religious enclave, in part because the district was drawn through "a special and unusual Act of the legislature" and "extend[ed] the benefit of a special franchise" to a religious entity. *Id.* at 702, 705.

The lower courts have been even more explicit in their condemnation of governmental action akin to that taken by the City at present. In *Foremaster v. City of St. George*, 882 F.2d 1485 (10th Cir. 1989), for instance, the Tenth Circuit addressed a governmental electricity subsidy provided to the Church of Latter Day Saints. Concluding that the subsidy ran afoul of the Establishment Clause, the court stated as follows: "The electric subsidy given by the City

---

[3] Federal appellate courts have agreed that Justice O'Connor's concurrence, and not the plurality opinion, represents the holding of *Mitchell*. *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1058 (9th Cir. 2007); *Columbia Union Coll. v. Oliver*, 254 F.3d 496, 504 n.1 (4th Cir. 2001); *DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 418 (2d Cir. 2001); *Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 510 n.2 (6th Cir. 2001).

impermissibly subsidized a religious institution.  The City gave no other church such a subsidy. It conveyed a message of City support for the [Church of Latter Day Saints] faith." *Id.* at 1489. Similarly, in *ACLU Foundation of Louisiana v. Blanco*, No. 07-04090, 2007 WL 2915092 (E.D. La. Oct. 5, 2007), the district court addressed the constitutionality of a state law that, among other things, appropriated funds to specified sectarian institutions.  Characterizing these as "non-neutral legislative appropriations," the court invalidated the transfer of funds.  *Id.* at *3.

As in each of these cases, the transfer at present of the property to the Catholic Diocese did not result from any neutral program that aids both secular and religious institutions.  It did not result from the placement of the property on the open market and its sale to the highest bidder.  And it did not result from a neutral bidding process applying even-handed criteria. Rather, the City initiated the planned transaction through a specific appropriation passed with the intention of benefiting a single religious institution.  As such, the City's actions violate the core Establishment Clause requirement that government aid be neutrally allocated.  Such "non-neutral, direct money grants of taxpayer funds to favored houses of worship are clearly unconstitutional under any Supreme Court test."  *Id.*

C. The transaction at issue in this case violates has the unconstitutional "effect" of advancing religion and results in an unconstitutional "endorsement" of religion.

As explained above, the non-neutral nature of the gifting to the Catholic Diocese of the property at issue in this case constitutes a preference for religion and is sufficient to render the transaction unconstitutional, and therefore it is unnecessary to delve in detail into the other, more fact-specific, requirements of the *Lemon* test.  However, if the Court chooses to do so, it is clear that this transaction violates the "effect" prong of this test and constitutes an illicit

"endorsement" of religion, even assuming that a secular purpose for the transaction exists and that the transaction does not result in excessive governmental entanglement with religion.[4]

### 1. Effect of Advancing Religion

In order for governmental action to comply with the Establishment Clause, its "principal or primary effect" must not "advance[] . . . religion." *Committee for Pub. Educ. & Religious Liberty v. Regan*, 444 U.S. 646, 653 (1980); *see also, e.g.*, *Committee for Pub. Educ & Religious Liberty v. Nyquist*, 413 U.S. 756, 783–85 & n.39 (1973); *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 222 (1963). In evaluating this criterion, it does not suffice for a governmental body to assert merely that, while an action has a religious benefit, its principal purpose is secular in nature: rather, the question is only whether the action "also has the direct and immediate effect of advancing religion." *Nyquist*, 413 U.S. at 783 n.39. Thus, in order for action to pass muster under this prong of the *Lemon* test, the government must demonstrate that it has "endeavor[ed] 'to guarantee the separation between secular and religious . . . functions and to ensure the [governmental] aid supports only the former.'" *Id.* at 783 (quoting *Lemon*, 403 U.S. at 613).

The Court has a lengthy history of deciding the constitutionality of aid offered to religiously affiliated institutions. Thus, in *Nyquist*, the Court examined two (2) separate provisions of state law: a provision authorizing direct governmental payments to nonpublic, primarily Catholic, schools for the purpose of performing building "maintenance and repair," *id.* at 774–80; and a provision reimbursing low-income parents of students at these schools for a portion of their children's tuition, *id.* at 780–89. Addressing the former provision, the Court drew the line as follows:

> No attempt is made to restrict payments to those expenditures related to the
> upkeep of facilities used exclusively for secular purposes, nor do we think it

---

[4] The plaintiffs have not yet engaged in discovery in this cause, and they expressly do not waive any claim that the transaction violates the other prongs of the *Lemon* test as well.

> possible within the context of these religion-oriented institutions to impose such restrictions. Nothing in the statute, for instance, bars a qualifying school from paying out of state funds the salaries of employees who maintain the school chapel, or the cost of renovating classrooms in which religion is taught, or the cost of heating or lighting those same facilities. Absent appropriate restrictions on expenditures for these and similar purposes, it cannot be denied that this section has a primary effect that advances religion in that it subsidizes directly the religious activities of sectarian elementary and secondary schools.

*Id.* at 774. Noting that the tuition reimbursements also "are subject to no such restrictions" on their use, the Court similarly concluded with respect to this provision that "the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions." *Id.* at 783.

The Court in *Nyquist* relied in part on its earlier decision in *Tilton v. Richardson*, 403 U.S. 672 (1971) (plurality opinion), a companion case to *Lemon* that the *Nyquist* Court characterized as "draw[ing] the line most clearly." 413 U.S. at 776. In *Tilton*, the Court addressed the constitutionality of a federal statute that *did* have a provision prohibiting the use of governmental aid for religious purposes: the statute at issue granted funds to religious educational institutions for building construction purposes, but conditioned an award on the recipient's agreement not to use the federally-financed buildings for religious purposes for twenty (20) years. *Id.* at 682–83. Said the Court in addressing this provision:

> Limiting the prohibition for religious use of the structure to 20 years obviously opens the facility to use for any purpose at the end of that period. It cannot be assumed that a substantial structure has no value after that period and hence the unrestricted use of a valuable property is in effect a contribution of some value to a religious body. Congress did not base the 20-year provision on any contrary conclusion. If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion.
>
> To this extent, the Act therefore trespasses on the Religion Clauses.

*Id.* at 683.[5]  *See also, e.g., Foremaster*, 882 F.2d at 1489 (holding that an electric subsidy to a religious institution had the impermissible effect of advancing religion insofar as "[a] governmental subsidy directed at religious institutions and not required by the Free Exercise Clause conveys a message of endorsement"); *Annunziato v. New Haven Bd. of Aldermen*, 555 F.Supp. 427, 433 (D. Conn. 1982) (holding that a transfer to a religious institution of property for $1.00 had an impermissibly religious effect).[6]

To be sure, the Court has clarified that neither *Nyquist* nor *Tilton* stands for the proposition that *any* governmental aid to religion is prohibited.  *See, e.g., Zelman v. Simmons-Harris*, 536 U.S. 639, 652–54 (2002) (payment for school voucher program); *Agostini v. Felton*, 521 U.S. 203, 226–29 (1997) (provision of secular supplemental educational services, mandated by the Elementary and Secondary Education Act, to students in religious schools); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8–12 (1993) (payment for sign language interpreter to

---

[5] Although *Tilton* was technically a four-justice plurality opinion, Justice White "accept[ed] the Court's invalidation of the provision . . . whereby the restriction on the use of buildings constructed with federal funds terminates after 20 years," 403 U.S. at 665 n.1 (White, J., concurring in the result), and the dissenting opinions would have similarly invalidated this provision (as well as additional provisions not invalidated by the Court), *see* 403 U.S. at 650–51 & n.10 (Brennan, J., dissenting in part); 403 U.S. at 692 (Douglas, J., joined by Black and Marshall, JJ., dissenting in part).  This portion of the *Tilton* Court's holding was therefore unanimous.

[6] In *Freedom from Religion Foundation v. Bugher*, 249 F.3d 606 (7th Cir. 2001), the Seventh Circuit, relying in part on *Nyquist* and *Tilton*, reaffirmed that direct government aid to religious institutions must be accompanied by effective restrictions against the use of the aid to support religious activities.  *Id.* at 612–14.  Quoting *Nyquist*, the court stated that "[i]n the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid in whatever form is invalid."  *Id.* at 614 (quoting 413 U.S. at 780).  Here, nothing in the Ordinance prohibits the school from using the property for religious activity, so the transaction plainly runs afoul of *Nyquist*, *Tilton*, and *Bugher*.  And it certainly does not take any effort in this case to envision the use of the property for religious purposes: after all, it is anticipated that the property will form part of an athletic campus at St. Joseph's High School and, as the school's student handbook makes clear, sectarian prayer is both desired and expected at all student competitions and practices.

Under *Nyquist* and *Tilton*, the mere absence of a restriction on the use of the property suffices to invalidate the City's action in this case under *Lemon*'s "effect" prong; the likely use of the property for religious purposes demonstrates why the restriction is necessary, and the transaction is unconstitutional for this reason as well.

deaf student eligible for services under the Individuals with Disabilities Education Act). However, the exceptions to the general ban on governmental aid to religious institutions are limited to two (2) scenarios: that in which the state's payments only reach religious institutions indirectly, through programs of purely private choice, as in the school voucher context of *Zelman*; and those in which religious institutions are simply permitted access to secular governmental services or supplies on the same terms and conditions as any other party as part of a neutral program, as in both *Agostini* and *Zobrest*.  The first exception clearly has no applicability here, and the second exception is equally inapplicable.

Unlike the situation in *Agostini* and *Zobrest* (and similar cases), the present transaction did not result from a neutral program such as the Individuals with Disabilities Education Act or the Elementary and Secondary Education Act.  Indeed, it did not even result from the placing of the property on the open market or from an open bidding process for the use of the property. Rather, the transaction represents a joint venture between the City and the Catholic Diocese whereby the City decided to make a substantial benefit available to one (1) religious institution and not to any other religious or non-religious institution.  *Cf. Freedom from Religion Found. v. City of Marshfield, Wis.*, 203 F.3d 487, 492 (7th Cir. 2000) (finding that a municipality's sale of property to a religious institution for fair market value was constitutional, but implying that it would have been unconstitutional if the municipality "ha[d] granted a religious organization a gift in the form of a sub-market rate sale price") (citing with approval *Annunziato*, 555 F.Supp. at 433).[7]

---

[7] In presenting the transaction at issue to the South Bend Common Council, the Mayor of South Bend indicated that the City had previously made an investment "at the Kroc Center on the west-side of South Bend, where they invested 1 million dollars to bring a 40 million dollar investment to the community." Of course, the fact that the City may have undertaken similar transactions in the past (and there is no indication that this "investment" is remotely similar) is utterly irrelevant to the issues before the Court. There is no doubt that the City may have previously allocated properties for the public's use (in the forms

Again, this distinction more than suffices to render the transaction unconstitutional. However, it deserves mention that, in those cases in which governmental aid flowing to religious institutions has been upheld, the Supreme Court found relevance in the fact that the aid was merely supplemental to resources devoted by the religious institution itself, and that the aid did not supplant those resources. *See Mitchell v. Helms*, 530 U.S. 793, 848–49 (2000) (O'Connor, J., concurring) (controlling opinion); *Agostini*, 521 U.S. at 210, 228–29. That is no so in the present case. As the Mayor of South Bend explained in introducing the ordinance currently at issue, before the City's involvement the Catholic Diocese had already examined the property at issue and decided either that it needed to be acquired for a sewer line or that the sewer line could be placed in the street. Regardless of the City's involvement, the Diocese's plans to construct an athletic complex would—and will—proceed. Either the Diocese or the City was going to expend money for these purposes. The fact that the City did made it so that the Diocese did not have to, and that is also relevant for the current analysis.

The transaction at issue in this case has an impermissible religious effect, and must be immediately enjoined for that reason as well.

### 2. Endorsement of Religion

Unlike the "effect" test, the "endorsement" test focuses not on the actual benefit bestowed to a religious institution, but on how that benefit is *perceived*. "Every government practice must be judged in its unique circumstances to determine" if there has been an endorsement. *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring). The issue, therefore, is whether a reasonable observer would deem the transaction to constitute an endorsement of religion. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779

---

of libraries, schools, parks, and so forth). The dispositive issue is that the transaction presently at issue was not part-and-parcel of a neutral governmental plan where all religious and non-religious institutions were put on equal footing in an attempt to acquire the property.

(1995) (O'Connor, J., concurring).  As the inquiry focuses on whether a person would believe an endorsement has occurred, the analysis is "fluid, and varies from case to case."  *Cohen v. City of Des Plaines*, 8 F.3d 484, 489 (7th Cir. 1993) (citation omitted).  Consequently, the inquiry "necessarily calls for line-drawing; no fixed *per se* rule can be framed.'" *Id.* (same).

The "endorsement" test has been widely acknowledged, however, to be similar in practice to *Lemon*'s "effect" test described above, *see, e.g.*, *Frelier v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 346 (5th Cir. 1999), and the focus on the objective perception rather than the actual effect does not significantly change the analysis.  "Under either the second *Lemon* prong or the endorsement test, the Supreme Court has cautioned that a government practice may not aid one religion, aid all religions, or favor one religion over another."  *Id.*  Whether viewed under the guise of "'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same.  The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny*, 492 U.S. at 593–94 (quoting *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring)).

In the case at bar, there can be no doubt as to the perception of the "reasonable observer": the City intends to bestow a gift worth $1.2 million on the Catholic Diocese.  This gift is not made contingent on its usage for exclusively secular purposes, and, regardless, has not been and is not being offered to any other religious or non-religious institution.  This is undeniable endorsement of the Diocese's religious viewpoint.  *Cf., e.g.*, *Bronx Household of Fiath v. Bd. of Educ.*, __ F.3d __, 2011 WL 2150974, at *11 (2d Cir. June 2, 2011) (collecting cases standing for the principle that benefits bestowed on a religious organization will not run afoul of the

"endorsement test" when they are "available to and used by numerous and diverse private groups").

>    *D. For Establishment Clause purposes, it makes no difference that the public may reap limited benefits from the transaction at issue in this case.*

It is true that the City has extracted a promise from the Diocese whereby the City and/or the public may be allowed to use the athletic facilities (once constructed) at times when the Diocese and its school are not using them.  While it is unclear at present the extent to which this will prove beneficial in practice—it is likely, after all, that there will be few occasions during which the property is not being used, and the City or the public may be charged a fee for its usage—the fact that some benefit from the transaction may be derived by the public is, quite frankly, irrelevant to the constitutional issues before the court.  For instance, in *Sloan v. Lemon*, 413 U.S. 825 (1973), government payments for parochial school tuition were invalidated even though, absent the program at issue, the state would have had to incur "intolerable" costs of more than $1.4 billion to provide education to those children itself.  *Id.* at 829–30.  In *Nyquist*, the state was not permitted to justify aid to sectarian schools by invoking "its concern for an already overburdened school system" or its interest "in preserving a healthy and safe educational environment for all its schoolchildren."  413 U.S. at 773–74.  And in *Lemon* itself, the non-religious benefits that were provided by sectarian schools were held irrelevant in striking down certain types of aid to these schools.  403 U.S. at 613, 625.  *See also, e.g.*, *Ams. United for Separation of Church & State v. Prison Fellowship Ministries*, 509 F.3d 406, 416–17, 424–25 (8th Cir. 2007) (state funding of religious treatment program for prisoners held unconstitutional even though it would have been more expensive for the state to provide substitute secular programming of its own).

The potential—at some future date, for some indeterminate cost, and with some limited availability—that South Bend residents may be able to make use of the athletic field does not change the constitutional calculus in this case.[8]

III.   THE PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THEIR CLAIMS THAT THE TRANSACTION AT ISSUE IN THIS CASE VIOLATES THE INDIANA CONSTITUTION.

    *A.   The transaction violates Article 1, Section 4 of the Indiana Constitution.*

Article 1, Section 4 of the Indiana Constitution provides that "[n]o preference shall be given . . . to any creed, religious society, or mode of worship." IND. CONST. art. 1, § 4 ("Section 4").  Although Indiana courts have not had frequent opportunity to elaborate on the meaning of this provision, the analysis to be employed is clear: a plaintiff challenging governmental action as violative of Section 4 must establish that that action "materially burdens [persons'] right to worship according to the dictate of conscience, the right freely to exercise religious opinions and rights of conscience, *or the right to be free from a government preference for a particular religious society or mode of worship*." *City Chapel Evangelical Free Inc. v. City of South Bend ex rel. Dep't of Redev.*, 744 N.E.2d 443, 451 (Ind. 2001) (emphasis added); *see also Burke v. State*, 943 N.E.2d 870, 877 (Ind. Ct. App. 2011).  This so-called "materially burdens" analysis requires a court to determine "[i]f the right, as impaired, would no longer serve the purpose for which it was designed." *Burke*, 943 N.E.2d at 877 (quoting *Price v. State*, 622 N.E.2d 954, 960 n.7 (Ind. 1993), *reh'g denied*).  Because little can be gleaned from Indiana's constitutional debates that would elucidate the meaning of Section 4, the text of that provision itself is the

---

[8] Indeed, it is unclear whether the athletic fields of the school are likely to contain religious symbols or other sectarian elements.  If they do, then, under some circumstances, public usage of these facilities may independently run afoul of the Establishment Clause. *See, e.g.*, *Does v. Enfield Pub. Schs.*, 716 F.Supp.2d 172, 192, 201 (D. Conn. 2010); *Musgrove v. School Board*, 608 F.Supp.2d 1303, 1305 (M.D. Fla. 2005); *Spacco v. Bridgewater Sch. Dep't*, 722 F.Supp. 834, 840–43 (D. Mass. 1989); *Lemke v. Black*, 376 F. Supp. 87, 89 (E.D. Wis. 1974).

"primary source for discerning the common understanding of the framers and ratifiers." *City Chapel*, 744 N.E.2d at 448.

The facts of *City Chapel* present the closest analogy to the facts of the present case. In *City Chapel*, as part of a plan to redevelop several buildings in its downtown area, the City of South Bend initiated condemnation proceedings against a chapel used, obviously, for religious purposes. *Id.* at 444–45. As it was permitted to do under Indiana law, the religious institution objected to the condemnation of its chapel as violative of, among other things, Section 4. *Id.* The institution argued that the municipality was affording preference to a "religious society or mode of worship" to the extent that it was allowing another church in the same district to remain in its building. *Id.* Although the trial court initially overruled the institution's objections without a hearing, the Indiana Supreme Court reversed, holding instead that the institution was entitled to an evidentiary hearing on its claims. *Id.* at 450. At this hearing, said the court, the party objecting to governmental action

> must establish its contention that the taking of its church building by condemnation, under the circumstances presented in this case, materially burdens its members' right . . . to be free from a government preference for a particular religious society or mode of worship. The effect of the taking must constitute a material burden, not merely a permissible qualification, upon the core values of the clauses asserted by City Chapel. Considering only the magnitude of the impairment and excluding any consideration for the social utility of the proposed condemnation, the taking will constitute a material burden on a core value only if the right, as impaired, would no longer serve the purpose for which it was designed. Although its constitutional challenge carries a very substantial burden of proof, City Chapel is entitled to an opportunity to present its claim for judicial determination.

*Id.* at 451 (internal citations, quotations, and alterations omitted). This standard, although a "substantial" one, is met in the case at bar.

By paying $1.2 million for a parcel of land and then transferring that property to the Catholic Diocese—without placing the property on the market or engaging in any form of open

20

bidding process—the City is demonstrating a clear and undeniable preference for the Catholic Church over other religions and non-religions.   Unlike in *Burke*, which concerned a sentencing enhancement for the burglary of a structure used for religious worship (that did not favor one religion over another and at best gave very slight legal protections to religious institutions in general), the transaction in the case at bar favors a specific religious institution over any other institution and confers a substantial and meaningful benefit to that specific institution.   Rather than acting in a neutral manner toward religion, the City has engaged in actions that preference one religion over all others.   Given the Indiana Constitution's clear mandate that "[n]o preference shall be given . . . to any creed, religious society, or mode of worship," and given the Indiana Supreme Court's recognition that the proper analysis under this provision begins and ends with the text of the provision itself, the transaction presently at issue cannot stand.

   B.  *The transaction violates Article 1, Section 6 of the Indiana Constitution.*

   Article 1, Section 6 of the Indiana Constitution forbids public money from being used "for the benefit of any religious or theological institution."  IND. CONST. art. 1, § 6 ["Section 6"]. The meaning of this provision is manifested most distinctly by the Indiana Supreme Court's decision in *Embry v. O'Bannon*, 798 N.E.2d 157 (Ind. 2003).   In that case, public money was used to pay public-school teachers to teach secular classes in parochial schools to students who were enrolled in both public and parochial schools in a "dual-enrollment" program.   Although this program was challenged by several taxpayer plaintiffs as violative of Section 6, the Supreme Court upheld the program, holding that the "determinative issue" is "whether the dual enrollment process . . . confers *substantial benefits* upon the participating parochial schools or directly funds activities of a religious nature."  *Id.* at 164 (emphasis added).   The Court found, in essence, a *de minimis* exception to the plain language of Section 6, holding that "an[] expenditure of public

money that might confer merely pecuniary incidental benefit to a religious institution" was not prohibited (and that the dual-enrollment program met this standard and was therefore constitutional). *Id.* at 164, 166–67.[9]

While Indiana courts have not since had opportunity to elaborate upon the distinction between an "incidental benefit"—as was at issue in *Embry*—and a more substantial benefit that would run afoul of Section 6, the differences between *Embry* and the present case make this distinction clear.  In *Embry*, the public funds went directly into the pockets of public school teachers who were permitted to teach exclusively secular subjects.  *Id.* at 166–67.  Both public school students participating in the dual-enrollment program and the public schools themselves were able to reap benefits from the program: the public school students were provided with a secular education, and the public schools were able to obtain increased funding as a result of the enrollment of students in the program.  *Id.*  At present, however, the City cannot deny that the benefit to be provided to the Catholic Diocese is substantial: it is a parcel of land that was recently purchased for $1.2 million.  Moreover, any benefit to the public from this transaction will be comparatively small.  Although the Diocese has apparently determined to permit either the City or the public to use its athletic complex once it is constructed, potentially for a fee, the Diocese will continue to own the property and the public will be prohibited from using it at any time the private school is using it.  This is far removed from the educational benefit received by the public in *Embry* or the increase in public-school funding received as a result of the dual-enrollment program: in *Embry*, the benefit to the religious school was incidental whereas the

---

[9] The *Embry* court also held that Section 6 does prohibit the use of even minimal public funds "when directly used for [religious] institutions' activities of a religious nature."  798 N.E.2d at 167.  Because prayers will occur at the athletic events hosted by St. Joseph's High School, the property will be used to support "activities of a religious nature" and the transaction violates Section 6 for this reason as well.

public benefit was substantial; at present, the benefit to the Diocese is substantial whereas any benefit to the public is incidental.

Indeed, it is instructive that the *Embry* court relied on cases decided under similar provisions in other states' constitutions in creating its "incidental benefit" rule. *Id.* at 165–67 (relying on cases from Michigan and Wisconsin). Like Indiana (as well as Michigan and Wisconsin), the California Constitution contains a provision prohibiting "an[y] appropriation . . . in aid of any religious" institution (Cal. Const. art. 16, § 5), which has also been interpreted to permit "an indirect, remote, and incidental benefit from a statute." *Cal. Statewide Communities Dev. Auth. v. All Persons Interested in the Matter of the Validity of a Purchase Agreement*, 152 P.3d 1070, 1080 (Cal. 2007) (citation omitted). Applying this rule, the California Supreme Court invalidated a statute loaning textbooks to religious schools at public expense as incapable of being "characterized as providing . . . only indirect, remote, and incidental benefits." *Cal. Teachers Ass'n v. Riles*, 632 P.2d 953, 962–64 (Cal. 1981). Other state courts have applied their own similar constitutional provisions to prohibit aid of a more substantial nature than that at issue in *Embry*. *See generally Gaffney v. State Dep't of Educ.*, 220 N.W.2d 550, 554–56 (Neb. 1974) (collecting cases from Idaho, Oregon, and Virginia).

The effect of the land transfer at issue in the case at bar is to provide a direct and substantial benefit to the Catholic Diocese. Any benefit received by the public will pale in comparison. This is far removed from the "incidental benefit" at issue in *Embry*, and this distinction is made clear by a plethora of cases decided under similar provisions of state constitutions. The transfer violates Section 6 as well.

**<u>Irreparable Harm for Which There is No Adequate Remedy at Law</u>**

Absent a preliminary injunction the plaintiffs will suffer irreparable harm for which there is no adequate remedy at law.  Of course, at this point it is well-established that the denial of constitutional rights is irreparable harm in and of itself.  "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."  *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g.*, *Cohen v. Coahoma County, Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.").  Indeed, in the First Amendment context, the Supreme Court has noted specifically that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  *See also, e.g.*, *ACLU v. City of St. Charles*, 794 F.2d 265, 275 (7th Cir. 1986) (applying same principle to Establishment Clause context); *Tanford v. Brand*, 883 F.Supp. 1231, 1237 (S.D. Ind. 1995) (same).  Indiana courts apply a similar rule.  *See, e.g.*, *Sadler v. State ex rel. Sanders*, 811 N.E.2d 936, 953 (Ind. Ct. App. 2004) ("[W]hen the acts sought to be enjoined are unlawful, the plaintiff need not make a showing of irreparable harm or a balance of hardship in his favor.").

There is no adequate remedy at law that can address this irreparable harm.  *See, e.g.*, *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) (holding that "money damages are [an] inadequate" remedy for the loss of First Amendment freedoms).  Indeed, this fact is underscored in the present case where, if the property transfer is permitted to proceed as scheduled, there may be no mechanism for the plaintiffs to ever receive a judgment on the merits of their claims: it is unclear as to whether a damages remedy would lie under these

circumstances, nor is it clear whether there exists an equitable remedy capable of restoring the property to governmental (and taxpayer) control.

## Public Interest and the Balance of Harms

As with the irreparable harm requirement, courts apply a *per se* rule as to the remaining preliminary injunction factors once a plaintiff demonstrates a likelihood of success on the merits: "[v]indication of constitutional freedoms is in the public interest." *See, e.g.*, *McIntire v. Bethel Sch.*, 804 F.Supp. 1415, 1429 (W.D. Okla. 1992). The public has a significant interest in ensuring the constitutionally appropriate use of large sums of taxpayer money. *See, e.g.*, *St. Charles*, 794 F.2d at 275. Moreover, against the certain and irreparable harm that will be caused to the plaintiffs if an injunction does not issue is the minimal, if any, harm faced by the City. The preliminary injunction will merely maintain the *status quo* pending a final resolution of the case, and a governmental body cannot claim that forcing it to comply with the dictates of the state or federal constitution is harmful.

### THE INJUNCTION SHOULD BE ISSUED WITHOUT BOND

The issuance of a preliminary injunction will not impose any monetary injuries on the City. In the absence of such injuries, no bond should be required. *E.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996); *see also Doe v. O'Connor*, 781 N.E.2d 672, 675 (Ind. 2003) (similar pronouncement under Indiana's trial rules). To require a bond in the present case would be to condition the exercise of the plaintiffs' constitutional rights on their ability to pay. No bond should be required.

### CONCLUSION

For the foregoing reasons, the plaintiffs are entitled to a preliminary injunction, issued without bond, enjoining the City from proceeding with the proposed transaction.

25

Respectfully submitted,

 /s/ Gavin M. Rose
Gavin M. Rose, No. 26565-53
Kenneth J. Falk, No. 6777-49
ACLU OF INDIANA
1031 E. Washington St.
Indianapolis, IN  46202
Ph.:    317.635.4059
Fax:    317.635.4105
<grose@aclu-in.org>
<kfalk@aclu-in.org>

Dan Mach[*]
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
915 15th Street, N.W.
Washington, D.C.  20005
Ph:    202.675.2330
Fax:    202.546.0738
<dmach@dcaclu.org>

Ayesha N. Khan[*]
Alex J. Luchenitser[*]
AMERICANS   UNITED   FOR
    SEPARATION OF CHURCH AND
    STATE
1301 K Street, N.W. – Ste. 850E
Washington, D.C.  20005
Ph:    202.466.3234
Fax:    202.898.0955
<khan@au.org>
<luchenitser@au.org>

*Attorneys for the plaintiffs*

---

[*] Application for admission *pro hac vice* to be filed.

26

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2010, a true copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Charles S. Leone
<cleone@lhklaw.com>


 /s/ *Gavin M. Rose*
Gavin M. Rose
Attorney at Law