UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ROY WIRTZ, ERIC BROWN, PETER ) 
REIMERS, and TIM DELANEY, )
 )
Plaintiffs )
 )
vs. )        CAUSE NO. 3:11-CV-325-RLM
 )
CITY OF SOUTH BEND, INDIANA )
 )
Defendant. )

OPINION AND ORDER

When Saint Joseph Regional Medical Center decided to vacate its 21-acre site in downtown South Bend, Indiana, a Catholic high school (St. Joseph's) was the only purchaser to step forward with solid interest in acquiring the site. St. Joseph's wanted to build a new high school on the site with athletic facilities. The high school wasn't able to negotiate the purchase of an adjacent property on which a Family Dollar store was operating. The City of South Bend purchased the Family Dollar parcel for $1.2 million, and plans to transfer the Family Dollar lot to St. Joseph's High School in exchange for opportunities to use, over the next ten years, the athletic and parking facilities that will be included at that location. Four South Bend taxpayers seek to enjoin the sale, arguing that South Bend's transfer of the property to a religious school would violate the Establishment Clause of the First Amendment to the United States Constitution, as well as Article I, sections 4 and 6, of the Indiana Constitution.

For the reasons that follow, the court finds that a transfer of the Family Dollar lot from the City to St. Joseph's High School would violate the Establishment Clause of the First Amendment to the United States Constitution, and so grants the taxpayers' motion for an injunction.

## I

In the early 2000s, Saint Joseph Regional Medical Center, then a hospital and medical center located in South Bend's downtown area, decided to move out of the city. City officials began a process of what to do with the 21-acre site. St. Joseph's High School, a private Catholic high school within South Bend operated and overseen by a Catholic Diocese, expressed an interest in relocating its campus to the former Medical Center site. The school owns other land outside South Bend that was considered as a possible site for a new campus. No other potential purchaser for the Medical Center site stepped forward.

A Family Dollar store was located on a 0.591 acre lot adjacent to the Medical Center site. This store was open for business and wasn't listed for sale on the open market. The school approached the Family Dollar store owners about an acquisition, but reached no purchase agreement. The City decided in summer 2007 to encourage St. Joseph's High School to relocate to the Medical Center location. South Bend representatives approached the Family Dollar owners about buying the store so the Family Dollar parcel could form a part of a new athletic complex for the high school's proposed campus. The City wanted this athletic

complex and the high school's relocation to the downtown Medical Center site for economic development and neighborhood revitalization purposes.[1] The Medical Center site was near South Bend's East Bank Village sector, and the City believed the high school's plans would be consistent with its East Bank Village Master Plan. The high school acquired the Medical Center property and began constructing the new high school. The new school building would not be on the Family Dollar lot; parts of the football stadium, the track, and a parking lot would be on the Family Dollar lot.

The South Bend Common Council took up the proposed purchase of the Family Dollar property.[2] The Common Council passed an authorization ordinance on June 27, and the Mayor signed it on June 28. The City maintains an economic development income tax fund[3] comprised of county economic development income taxes that are paid to the county and then distributed into the City's economic development income tax fund.[4] The Ordinance allocated $1.2 million from the City's economic development income tax fund for "St. Joseph Hospital area site consolidation for economic and community development investment ($1,200,000)," for the purchase of the Family Dollar store, for the lot on which the Family Dollar

[1] The City's defined mission includes revitalizing its neighborhoods and promoting economic development activity within the city.

[2] The City conducts its legislative affairs through a nine-member Common Council.

[3] The fund was established under Indiana Code § 6-3.5-7-13.1.

[4] *See* IND. CODE §§ 6-3.5-7-5, 6-3.5-7-12.

store sits, and for termination of the existing Family Dollar store lease. The City has taken title to the Family Dollar store property. The City always intended to transfer title to the Family Dollar property to the St. Joseph's High School. The high school, in turn, is to provide nonmonetary consideration for the property, although the precise contours of that consideration weren't fully developed until the week of August 22, 2011.

The City hasn't placed the Family Dollar property on the open market, solicited bids for it, or tried to sell it to the highest bidder, and it doesn't intend to do any of those things. The City intends to transfer title to the property to an Indiana non-profit corporation,[5] which then will transfer the property to St. Joseph's High School. The high school will demolish the Family Dollar store and construct a football stadium and track on the property.

The high school intends to allow the South Bend community to the use the football stadium, the track, and other portions of the school campus for the next ten years on the terms and conditions outlined in an agreement for services. All parties to the transaction have approved the agreement for services, but the parties haven't yet performed their obligations under the services agreement and the City still holds title to the property. Other than what is specified in the agreement for services, no consideration for the property has been offered or will be received. The agreement for services provides that, "No participation in any

---

[5] That non-profit corporation is Northeast Neighborhood Revitalization, Inc., which is exempt from federal taxation and meets the requirements of Indiana Code § 36-1-11-1(b)(7).

religious activity shall be required of any participant in any service provided under Exhibit 'A' to this Agreement." The City and St. Joseph's High School have no other agreement about using the property for religious activity or purposes.

St. Joseph's High School is spending some $35 million on the construction of its new campus. Construction of the campus began before South Bend acquired the Family Dollar property and before this suit was filed. St. Joseph's High School has several athletic teams, some of which would compete and/or practice on the property once the football stadium and track have been constructed. The high school requires all students to receive a Catholic education and to complete a certain number of credit hours in theology. The St. Joseph's High School Student-Parent Handbook for 2011–2012 provides that all school athletic practices and competitions should be preceded and/or concluded by a prayer.

The City expects to transfer the property to the non-profit corporation for eventual transfer to the school by September 15, but not before September 9, 2011. If St. Joseph's High School doesn't assume title to the property by September 15, it might be unable to finish construction of its campus by August 2012 and might incur costs associated with construction delays.

Plaintiffs Roy Wirtz, Eric Brown, Peter Reimers, and Tim Delaney are adult residents of, and pay municipal income and property taxes to, South Bend and St. Joseph County, Indiana. Among the taxes they pay are county economic development income taxes, which are paid to St. Joseph County and then distributed into South Bend's economic development income tax fund. The

plaintiffs have paid county economic development income taxes to St. Joseph County for at least the past several years. These taxpayer-plaintiffs object to the use of their taxes to benefit a religious institution such as St. Joseph's High School. The plaintiffs don't want their taxes to be used for that purpose. They seek a preliminary injunction (and a permanent injunction) barring the City of South Bend from transferring the Family Dollar property to St. Joseph's High School.

The case came before the court for hearing on the plaintiffs' preliminary injunction motion on August 31. The court inquired whether the parties wished to advance the trial on the merits, and on September 6 the parties stipulated to merging the trial on the merits with the preliminary injunction hearing, as allowed by Rule 65(a)(2) of the Federal Rules of Civil Procedure.

## II

The ordinary case in which a taxpayer plaintiff seeks an injunction against action said to violate the Establishment Clause presents a variety of issues that aren't presented in this case. The plaintiffs and the City have narrowed their dispute commendably, allowing for a quicker and cleaner decision on today's motion.

The court first considers, in part II-A of this opinion, the plaintiffs' standing to sue, which, while not contested by the parties, is required for any constitutional challenge. The court then turns, in part II-B, to the parties' disagreement over precisely what legal standard is to be used in weighing the constitutionality of the

Family Dollar transaction. Part II-C explains the parties' arguments, and part II-C-1 sets forth in greater detail the City's argument that the Family Dollar transaction has to be seen in the context of a broader set of transactions. In part II-C-2, the court discusses the cases on which the City placed its main reliance, including the most recent Supreme Court decision on school vouchers. In part II-C-3, the court considers the effect of the City's past contributions to development projects. Part II-C-4 of the opinions addresses whether the Family Dollar transaction has the effect of advancing or endorsing religion.

Part III addresses the plaintiffs' claims under the Indiana Constitution. Part IV of the opinion summarizes the court's ruling and sets forth the court's final order.

A

The City doesn't question the plaintiffs' standing to bring this suit or seek this relief — in other words, the City doesn't contend that the plaintiffs don't have the sort of interest in the case that allows a person to bring suit. While the parties can't confer jurisdiction by not raising the issue, DaimlerChrysler Corp. v. Cumo, 547 U.S. 332, 341 (2006) (*citing* Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc., 528 U.S. 167, 180 (2000)), the plaintiffs appear to have standing as municipal taxpayers. To have standing as municipal taxpayers, plaintiffs must show that the municipality's action is an invasion of their personal, legally protected interest. Lujan v. Defenders of Wildlife, 504 U.S.

555, 560 (1992). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." Id. at 562 (internal quotations omitted); *accord* MainStreet Organization of Realtors v. Calumet City, Ill., 505 F.3d 742, 752 (7th Cir. 2007). Federal and state taxpayer grievances might violate standing doctrine, *see* Massachusetts v. Mellon, 262 U.S. 447, 487 (1923) (holding that the relationship between the individual taxpayer and the money in the federal treasury is so attenuated that the taxpayer cannot claim a personal injury based on how that money is spent), but municipal taxpayer standing is different. "Municipal taxpayers have standing to challenge tax dollar expenditures that allegedly contribute to Establishment Clause violations." Gonzales v. North Township of Lake Cnty., Ind., 4 F.3d 1412, 1416 (7th Cir. 1993) (*citing* Flast v. Cohen, 392 U.S. 83, 88 (1942)).

Municipal taxpayer plaintiffs must show that (1) they are actually municipal taxpayers, and (2) tax money was used to fund the contested project. Freedom From Religion Foundation, Inc. v. Zielke, 845 F.2d 1463, 1470 (7th Cir. 1988). Mr. Wirtz, Mr. Brown, Mr. Reimers, and Mr. DeLaney are residents of the City of South Bend, that each pays municipal income and property taxes, and that the City used tax dollars to acquire the Family Dollar parcel. The City's proposed action of donating the property is the cause of the loss to the treasury and could be redressed by enjoining the transfer.

This suit also claims violation of Indiana's Constitution, so Indiana law governs standing to bring such a claim. Indiana law recognizes a "public standing exception to the general standing requirement," which specifically allows suits brought on a shared public interest as a taxpayer. Embry v. O'Bannon, 798 N.E.2d 157, 160 (Ind. 2003). The Indiana Constitution provides that "[n]o money shall be drawn from the treasury, for the benefit of any religious or theological institution." IND. CONST. Art. 1, § 6. These plaintiffs have alleged enough facts to show a violation of this provision and, under the holding in Embry, have standing to challenge the validity of the property transfer.

B

The First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I. The Fourteenth Amendment makes the Establishment Clause applicable to the States. Everson v. Board of Educ. of the Township of Ewing, 330 U.S. 1, 15 (1947). Courts have safeguarded this provision by drawing a wide perimeter around it and preventing governments from endorsing one religion over others or religion over non-religion. Government sponsorship of a religious message is forbidden because "it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and the accompanying message to adherents that they are insiders, favored members of the political

community.'" Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 309-310 (2000) (*quoting* Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)).

Courts generally analyze Establishment Clause cases under various versions of a three-prong test: the governmental action must (1) have a secular purpose, (2) have a principal or primary effect that neither advances nor inhibits religion, and (3) not foster excessive government entanglement with religion. *See, e.g.,* Sherman ex rel. Sherman v. Koch, 623 F.3d 501, 507 (7th Cir. 2010) (*citing* Lemon v. Kurtzman, 403 U.S. 602 (1971)). If the governmental action fails any of the three parts of this test, it violates the Establishment Clause. *See, e.g.,* Freedom from Religion Foundation, Inc. v. Bugher, 249 F.3d 606, 611 (7th Cir. 2001).

The plaintiffs don't claim that the City's anticipated transfer of the Family Dollar parcel violates the first or third prong of the Lemon test: they don't contest the City's secular purpose to revitalize the East Race area or contend that the proposed transaction will excessively entangle a governmental body with a religious institution. This allows the court to focus entirely on the second prong, namely, whether the transfer of the Family Dollar parcel will have the principal or primary effect of advancing or inhibiting religion. *Cf.* Mitchell v. Helms, 530 U.S. 793, 807 (2000) ("in Agostini we modified Lemon for purposes of evaluating aid to schools and examined only the first and second factors") (plurality opinion).

The plaintiffs and the City both contend at the outset that their dispute can be resolved without resort to the Lemon test. The court disagrees. Our court of

appeals routinely turns to the <u>Lemon</u> test when deciding Establishment Clause issues. *See, e.g.,* <u>Sherman ex rel. Sherman v. Koch</u>, 623 F.3d 501, 507-508 (7th Cir. 2010); <u>Milwaukee Deputy Sheriffs' Ass'n v. Clarke</u>, 588 F.3d 523, 527-528 (7th Cir. 2009); <u>Books v. Elkhart Cnty., Ind.</u>, 401 F.3d 857, 862-863 (7th Cir. 2005); <u>Mercier v. Fraternal Order of Eagles</u>, 395 F.3d 693, 704 (7th Cir. 2005). The court of appeals hasn't yet articulated a standard governing when <u>Lemon</u> needn't be applied, *see, e.g.,* <u>Badger Catholic, Inc. v. Walsh</u>, 620 F.3d 775 (7th Cir. 2010); <u>Freedom from Religion Foundation, Inc. v. McCallum</u>, 324 F.3d 880 (7th Cir. 2003), and the parties haven't persuaded the court that reason exists to take a different approach.

The analysis of the primary effect prong has developed into an analysis of whether the action appears to favor or endorse a religion, that is, whether "the practice under review in fact conveys a message of endorsement or disapproval." <u>Freedom from Religion Foundation, Inc. v. City of Marshfield, Wis.</u>, 203 F.3d 487, 493 (7th Cir. 2000); *see also* <u>Lynch v. Donnelly</u>, 465 U.S. at 690; <u>County of Allegheny v. American Civil Liberties Union</u>, 492 U.S. 573, 595 (1989). In her concurring opinion in <u>Lynch v. Donnelly</u>, Justice O'Connor wrote that "[e]ndorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." 465 U.S. at 688. The Supreme Court later adopted this analysis in <u>Allegheny v. ACLU</u>: "we must ascertain whether the challenged governmental action is sufficiently likely

to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." 492 U.S. at 597.

In 2005, our court of appeals, in evaluating a display of the Ten Commandments, defined what the endorsement test is and isn't:

> Thus, we do not ask whether there is any person who could find an endorsement of religion, whether some people may be offended by the display, or whether some reasonable person might think the State endorses religion. Rather, we ask whether an objective, reasonable observer, aware of the history and context of the community and forum in which the religious display appears, would fairly understand the display to be a government endorsement of religion. This standard presupposes a person of ordinary understanding and sensibility, familiar with the circumstances surrounding the display. Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion.

Books v. Elkhart Cnty., Ind., 401 F.3d 857, 867 (7th Cir. 2005) (internal citations and quotations omitted).

The City suggests that the endorsement test has disappeared from the Supreme Court's Establishment Clause jurisprudence because it wasn't mentioned in Mitchell v. Helms, 530 U.S. 793 (2000). Justice O'Connor's concurring opinion — essential to the majority — strives to apply the endorsement test, 530 U.S. at 842-845, but, in any event, it isn't the role of a district court to decide Supreme Court precedent has been implicitly overruled. See Agostini v. Felton, 521 U.S. 203, 217 (1997) ("The views of five Justices that the case should be reconsidered or overruled cannot be said to have effected a change in

Establishment Clause law."). The endorsement test is alive and quite healthy in this circuit. *See, e.g.,* Sherman ex rel. Sherman v. Koch, 623 F.3d 501 (7th Cir. 2010) ("Under this prong, the question is: 'irrespective of government's actual purpose, whether the practice under review in fact conveys a message of endorsement or disapproval.'") (*quoting* Freedom from Religion Foundation, Inc. v. City of Marshfield, Wis., 203 F.3d 487, 493 (7th Cir. 2000)); Milwaukee Deputy Sheriffs' Ass'n v. Clarke, 588 F.3d 523, 528 (7th Cir. 2009) ("The second prong of the Lemon test, however, requires no inquiry into the government's intent. The appearance of endorsement of religion alone can send a 'message to nonadherents that they are outsiders, . . . and an accompanying message to adherents that they are insiders.'") (*quoting* Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)); Books v. Elkhart County, Indiana, 401 F.3d at 866.

## C

Governmental programs or actions that provide special benefits to specific religious entities are impermissible. For instance, the Supreme Court held unconstitutional a statute that created a special school district that followed village lines for a religious enclave. Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 702, 705 (1994). The Court also invalidated a statute that gave a tax exemption to religious periodicals but not to similar secular periodicals. Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989). The court of appeals for the Tenth Circuit held that an electrical subsidy given by a municipal

utility to a Mormon temple violated the Establishment Clause. <u>Foremaster v. City of St. George</u>, 882 F.2d 1485 (10th Cir. 1989). A Louisiana district court found that direct, unrestricted appropriations to religious organizations were invalid under the Establishment Clause. <u>ACLU Foundation of Louisiana v. Blanco</u>, No. 07-04090, 2007 WL 2915092 (E.D. La. Oct. 5, 2007).

For governmental aid to religious institutions to be seen, for constitutional purposes, as not "endorsing" religion, either the state's payments must reach religious institutions only indirectly through programs of purely private choice, *see, e.g.*, <u>Zelman v. Simmons-Harris</u>, 536 U.S. 639, 652–654 (2002) (school vouchers), or religious institutions must be getting nothing more than to secular governmental services or supplies on the same terms and conditions as anyone else as part of a neutral program. *See, e.g.,* <u>Agostini v. Felton</u>, 521 U.S. 203, 226–229 (1997); <u>Zobrest v. Catalina Foothills Sch. Dist.</u>, 509 U.S. 1, 8–12 (1993).

The plaintiffs argue that the Family Dollar transaction can best be described as a joint venture between the City and St. Joseph's High School in which the City is making a substantial benefit available to one religious institution to the exclusion of any other religious or non-religious institution. The plaintiffs argue that transfer of the Family Dollar parcel won't result from any neutral program that aids both secular and religious institutions, or from the placement of the property on the open market and its sale to the highest bidder through the open market, or through a neutral bidding process applying even-handed criteria. The City's expenditure of its EDT money simply spared the high school the need to

raise funds to acquire the Family Dollar parcel. Thus, the plaintiffs say, the transaction has the effect of endorsing religion.

When deciding whether a transaction amounts to an "endorsement" of religion for Establishment Clause purposes, courts consider whether a reasonable, well-informed observer would see the transaction as an endorsement of religion. Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 779 (1995) (O'Connor, J., concurring). The City, the plaintiffs argue, is about to bestow a $1.2 million gift on St. Joseph's High School — a gift neither contingent on its being used only for exclusively secular purposes nor offered to any other religious or non-religious institution. The City's right to use the facilities for non-secular purposes over the next decade, the plaintiffs argue, makes it no less an endorsement of the Catholic faith. That the public derives some benefit from the transaction is of very little relevance when looking for endorsement of religion. Sloan v. Lemon, 413 U.S. 825, 829-830 (1973); Committee for Public Educ. and Religious Liberty v. Nyquist, 413 U.S. 756, 773-774 (1973); Lemon v. Kurtzman, 403 U.S. at 613, 625.

1

The City stresses that the transaction is a limited one and must be viewed in a broader context. The City notes that what is at issue is not injection of government into the high school's educational curriculum or religious practices, not payment of salaries or payment for supplies or operations, not the purchase

15

of materials for the school building, not an incentive or inducement for anyone to attend St. Joseph's High School, and is only a small part of what St. Joseph's High School is spending for its new high school project.[6]

The City says this transaction can't be seen simply as one in which the City transfers a parcel for which it paid $1.2 million in exchange for limited rights of use. First, the City argues, the Family Dollar transaction should be seen as inducement for St. Joseph's High School's decision to acquire and improve (to the tune of $35 million) what otherwise would have been a ghostly 21-acre vacancy in downtown South Bend: when the Family Dollar owners refused to sell to the high school, City officials told the high school the City would get Family Dollar parcel for the school if the broader development went forward.

Further, the City says, the Family Dollar transaction must be viewed in the context of many other transactions in which the City facilitated development by non-religious private entities, non-religious public schools, and another religious organization. In reverse chronological order:

- In 2010, South Bend transferred land, $1 million in city funds and $2 million in state funds to the Salvation Army for its use in creating the Ray and Joan Kroc Corps Center in South Bend. The Salvation Army's Mission Statement reads as follows: "The Salvation Army, an international movement, is an evangelical part of the universal

---

[6] The City compares its $1.2 million to the Ohio taxpayers' commitment of $8.2 million for each of ten years at issue in <u>Zelman v. Simmons-Harris</u>, 536 U.S. 639 (2002), which the court discusses shortly.

Christian Church. Its message is based on the Bible. Its ministry is motivated by the love of God. Its mission is to preach the gospel of Jesus Christ and to meet human needs in His name without discrimination." Under its agreement with South Bend, the Salvation Army undertook to operate recreation, training, and other programs available to all citizens of South Bend without regard to religious affiliation.

- Also in 2010, the City transferred to the real estate company of Ivy Tech (a public college) real property the City had acquired for $345,000. The transfer was to help Ivy Tech expand administrative offices that had been displaced by an expanding student enrollment.

- Also in 2010, the City transferred to East Bank South Bend Development, for $10, property the City had acquired for $437,630. The transfer was to help with development of a condominium project for downtown housing. As noted earlier, the Medical Center property on which this high school is being built is near the East Bank area.

- In 2009, the City transferred three parcels of real estate (for which the City had paid $302,250) to Fire Arts for a new location for artists' studios. This transfer was, the City reports, consistent with the East Bank Village Master Plan.

- Also in 2009, the City provided $500,000 to help provide physicians' offices and rehabilitate a clinic operated by Saint Joseph's Regional Medical Center.

- In 2007, the City sold a parking lot for $2 to Michigan Street, LLC, to allow for parking for condominium and office development.

- Also in 2007, the City sold a downtown building to Wightman Pietrie, a local business, as part of Economic Development assistance to retain the business downtown and to help it expand. The City had acquired the property for $350,000 and sold it to Wightman Pietrie for $131,000.

- In 2006, the City sold a downtown building it had already acquired to a locally owned business, South Bend Chocolate Company, for $100,000, as Economic Development assistance to allow the local business to expand into vacant, adjacent space.

- In 2001, the City vacated a city street to the South Bend Community School Corporation so that a local public high school could expand its athletic fields.

The City says that its purpose is secular — to provide the last piece of the real estate puzzle needed to create, not a religious school, but, rather, a football field and a track. Courts generally defer to what the government sets forth as its secular purpose unless it is a sham. Sherman v. Koch, 623 F.2d 501, 508 (7th Cir. 2010); *see also* Mueller v. Allen, 463 U.S. 388, 394 (1983). Providing a small

slice of land — 0.59 acres out of what will be almost a 22-acre site — for athletic purposes, the City says, isn't advancing religion by providing "improper [religious] content." Mitchell v. Helms, 530 U.S. 793, 825 (2000). The City questions whether "endorsement" of religion remains part of the Lemon test, but says that even if it does, the Family Dollar parcel's value exists only because of what St. Joseph's High School — and no other entity, secular or not — is doing with the Medical Center site so close to downtown South Bend. This is economic development, the City says, not endorsement of anyone's religious viewpoint.

2

Neither the parties nor the court have found a case precisely like this one. The parties cite cases with some similarities, but, ultimately, none point the court unerringly toward either outcome.

The City sees Zelman v. Simmons-Harris, 536 U.S. 639 (2002), as the most instructive case. In Zelman, the state of Ohio offered Cleveland residents checks they could endorse over to schools to offset tuition costs. The voucher could be used at private religious schools, private non-religious schools, and public schools in suburbs contiguous to Cleveland. Forty-six of the 56 schools that participated in the program were religiously affiliated, and of the 3,700 students who enrolled in the program, 96 percent used their vouchers at religiously affiliated schools.

Notwithstanding the flow of significant money into the hands of religious entities, the Supreme Court found the statute to be constitutional in light of the

teaching of three earlier decisions. In <u>Mueller v. Allen</u>, 463 U.S. 388 (1983), the Court upheld a state tax deduction for private education, even though 96 percent of the children who attended private schools went to religious schools. By making the deduction available to parents, the state indirectly channeled benefits to the religious schools because parents were more readily able to afford private school. 463 U.S. at 399. The Court held that "[t]he historic purposes of the [Establishment Clause] simply do not encompass the sort of attenuated financial benefit, ultimately controlled by the private choices of individual parents, that eventually flows to parochial schools from the neutrally available tax benefit at issue in this case." 463 U.S. at 400.

In <u>Witters v. Washington Department of Services for the Blind</u>, 474 U.S. 481, 489 (1986), the Court held that a program that finances higher education could be used to finance study in theology without offending the Establishment Clause. Like <u>Mueller v. Allen</u>, the <u>Witters</u> analysis turned on the money going through the beneficiary's hands before reaching the religious institution. 474 U.S. at 488 ("Any aid provided under Washington's program that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients.").

Finally, in <u>Zobrest v. Catalina Foothills School District</u>, 509 U.S. 1, 13-14 (1993), the Court held that the Establishment Clause doesn't prevent a publicly-funded sign language interpreter from being assigned to a child in a religious school. The Court distinguished cases that had invalidated aid directly to schools,

pointing out that if the religious school benefitted from the interpreter's presence, that benefit was only incidental. The intended beneficiary, the handicapped child, didn't invalidate the service by utilizing it in a parochial school. 509 U.S. at 13.

When considering the Cleveland voucher program, the Zelman Court relied on the reasoning of Mueller, Witters, and Zobrest. The vouchers weren't direct aid to a religious entity, but were aid to residents of a city with a beleaguered school system, even though there was a good chance that the vouchers would be used at religious schools. 536 U.S. at 653. The program was deemed neutral as to religion because the program left the decision of which school to fund solely in the hands of numerous, independent decision makers. 536 U.S. at 655.

Today's case isn't Zelman. There is no independent decision maker. In Zelman (as in Mueller, Witters, and Zobrest), the benefits reached a religious organization only because of an independent decision made by a citizen. Each city resident who received a voucher could use it at a variety of different schools, public, private non-religious, and private religious. Thus, when state voucher money landed at a religious school, it reflected only parental choice in sending children there; the state remained neutral. The Family Dollar property will move from the City's hands to the high school's hands without the sort of intervening actors that the Zelman Court found created neutrality.

Neither is this case like those the City cites in which governments transferred real estate to religious institutions. The City notes that the Second Circuit Court of Appeals upheld, over a First Amendment challenge, a city's sale

21

of property to a Hasidic community as part of an urban renewal program. Southside Fair Housing Committee v. City of New York, 928 F.2d 1336 (2d Cir. 1991). That the land "was sold, rather than 'handed over' to the Hasidim" was critical to the court's analysis, 928 F.2d at 1348, making that analysis inapplicable in a case like this in which a municipality acquires land for $1.2 million and exchanges it for limited rights of use.

The City also cites to Fairfax Covenant Church v. Fairfax County School Board, 17 F.3d 703 (4th Cir. 1994), in which the City says the Fourth Circuit Court of Appeals held that a school board's below-market lease of public facilities didn't violate the Establishment Clause. The court reads that opinion differently. As the court reads the opinion, the school board adopted a regulation establishing rental rates for off-hour use of the county's schools. The regulation set an escalating rate only for churches. The school board explained that if it didn't try to discourage the churches from using the public schools, it might run afoul of the Establishment Clause. 17 F.3d at 706; see Committee for Public Educ. and Religious Liberty v. Nyquist, 413 U.S. 756, 788 (1973) ("this Court repeatedly has recognized that tension inevitably exists between the Free Exercise and the Establishment Clauses"); Badger Catholic, Inc. v. Walsh, 620 F.3d 775 (7th Cir. 2010) (finding that funding a religious organization's speakers through student fees did not violate the Establishment Clause as long as the reimbursement was made on the same basis as that used to reimburse other student groups). The court of appeals found that charging churches more for off-hours use

22

discriminated against religious speech in violation of the First Amendment's Free Speech Clause and also violated the churches' rights under the First Amendment's Free Exercise Clause. 17 F.3d at 707. As the court reads the opinion, <u>Fairfax Covenant Church</u> provides no support for the proposition that a municipality can give religious institutions a better deal than what is available to others.

Finally, the City cites <u>Annunziato v. New Haven Board of Aldermen</u>, 555 F. Supp. 427 (D. Conn. 1982), in which the district court approved the sale of a school in a blighted area to a religious organization, finding that the primary effect of the entire process wasn't to aid the group's religious purpose. Again, the court reads the case differently than the City does. After the City of New Haven decided to close its Roger Sherman School, a religious organization called "The Gan" offered to buy the building for $30,000. The New Haven aldermen decided that since they were closing the building any way, there was no reason for The Gan to spend that much money, and New Haven sold the building to the Gan for one dollar. The district court found that by selling the building to a religious institution at below-market rates, New Haven had violated the Establishment Clause. 555 F. Supp. at 433 ("[T]he sale of the Roger Sherman School to The Gan for $1 after The Gan offered $30,000 for the property violated the Establishment Clause because there was no secular purpose in the rejection of the offer and the primary effect of the action was to relieve The Gan of $29,999 expected indebtedness.").

The City's strongest argument is that it has a long-range plan to aid development in the City with a variety of willing partners. The City maintains that it has neither more or less interest in promoting the religious message of St. Joseph's High School than it has in promoting the particular business message of one of the businesses it aided, the vision statement of one of the charities it aided, or the religious message of the Salvation Army to which it contributed significant money. The Family Dollar transaction, the City says, is simply one in a series of economic-development actions it has taken or will take. The City contends that since most of those transactions have nothing to do with religion and it is only incidental that its development partner this time is a religious organization, the transaction resembles other neutrally-administered programs that courts have approved and doesn't violate the Establishment Clause.

When the City contemplated this transaction, it did so as part of a long-range vision of development initiatives aimed at revitalizing a part of South Bend called the East Race. In 2007, the City began a strategic planning process for the general area that includes this property. That plan noted one of the catalysts for development as "[t]he City Administration is prepared to make pre-development and partnership financial investments in the East Bank area upon completion of a community supported strategic development strategy." The plan further noted that while the Saint Joseph Regional Medical Center site was outside the East

Race, the redevelopment of this property by St. Joseph's High School was a catalyst since the property is contiguous to the East Race area.

As already discussed, the City has entered into a variety of transactions with business, non-profit, and religious entities, all in the interest of redeveloping areas or encouraging economic expansion. In each of the eight examples of development the City has provided in support of its case, the development partner brought something of value to the transaction. For instance, two local companies expanded their operations with help from the City; a community college relocated its offices to unused space; and the Salvation Army started a program for youth. The City says its objectives are similar with respect to St. Joseph's High School and the Family Dollar parcel, and this transaction is just one in a series of similar transactions. The City claims that while the high school won't pay any money for the property, it will provide the City with two other benefits. First, the City, local schools, and even the general public will be able to use the athletic facilities and parking lot under certain conditions and with payment of certain costs. Second, the high school will redevelop the entire Saint Joseph Regional Medical Center site, which otherwise would be unproductive vacant property.

a

Despite the City's (accurate) insistence that it is to receive nonmonetary consideration from the high school in exchange for the Family Dollar parcel, this isn't a market-value sale as in <u>Mercier v. Fraternal Order of Eagles</u>, 395 F.3d 693,

702-703 (7th Cir. 2005), or <u>Freedom from Religion Foundation, Inc. v. City of Marshfield, Wis.</u>, 203 F.3d 487, 492 (7th Cir. 2000). The City sees itself as receiving the benefits of a $35 million development in its downtown area. But St. Joseph's High School is receiving more from the City than it is giving the City in exchange, and so is receiving a direct benefit, not by the act of some independent actor such a parent, but from the City.

The below-market transfer places this case, like <u>Foremaster v. City of St. George</u>, 882 F.2d 1485, 1489 (10th Cir. 1989) (electricity subsidy violated Establishment Clause), and <u>Annunziato v. New Haven Board of Aldermen</u>, 555 F. Supp. 427 (D. Conn. 1982) (sale of building for $1 after church offered $30,000 violated Establishment Clause), among those cases in which courts must decide whether a transfer to a religious institution of the equivalent of cash amounts to an endorsement or advancement of religion.

Governmental agencies generally "may not make unrestricted cash payments directly to religious institutions," <u>Freedom from Religion Foundation, Inc. v. Bugher</u>, 249 F.3d 606, 611-612 (7th Cir. 2001), and "the State may not grant aid to a religious school, whether cash or in kind, where the effect of the aid is 'that of a direct subsidy to the religious school' from the State." <u>Id</u>. at 612 (*quoting* <u>Witters v. Washington Dep't of Servs. for the Blind</u>, 474 U.S. 481, 487 (1986)). While the telecommunications subsidy for private schools at issue in <u>Freedom from Religion Foundation v. Bugher</u> might not seem to put government in the role of indoctrination, the court of appeals clarified that when the recipient

of the aid is active in religious indoctrination, any assistance it receives can be used as such. 249 F.3d at 612. A direct subsidy of a pervasively sectarian institution can lead directly to government indoctrination and can violate the Establishment Clause. "The question whether governmental aid to religious schools results in governmental indoctrination is ultimately a question whether any religious indoctrination that occurs in those schools could reasonably be attributed to governmental action." 249 F.3d at 611 (*quoting* Mitchell v. Helms, 530 U.S. 793 (2000)).

Still, the Establishment Clause and Lemon don't absolutely prohibit any aid to religious organizations. *See* Mueller v. Allen, 463 U.S. 388, 393 (1983) ("One fixed principle in this field is our consistent rejection of the argument that any program which in some manner aids an institution with a religious affiliation violates the Establishment Clause." (quotations omitted)). When the aid is neutral between religions and neutral between religion and non-religion, that aid doesn't violate the Establishment Clause. There are two ways to achieve neutrality: (1) when the aid flows to religious organizations only because of a private, independent choice made by a third party, as in Zelman v. Simmons-Harris, 536 U.S. 639 (2002), or (2) when the aid to the religious organization is an incidental part of a larger and neutral program. The court already has discussed the first line of cases and concluded that because there is no independent third party deciding who gets the benefits of the Family Dollar transaction, today's case doesn't fit there. The court turns to second line of cases.

Although the case itself turned on the presence of an independent recipient of the benefits, the Supreme Court in <u>Zobrest v. Catalina Foothills School District</u>, 509 U.S. 1, 8 (1993), explained the reasoning of the second line of cases: "government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit."

In <u>Bowen v. Kendrick</u>, 487 U.S. 589 (1988), the Court evaluated whether grants made available to prevent adolescent pregnancy could be awarded to religious organizations. While the successful applicants were a variety of health centers, hospitals, and local community centers, some were religiously affiliated and others were not. The plurality opinion reiterated that "religious institutions need not be quarantined from public benefits that are neutrally available to all." 487 U.S. at 608 (*quoting* <u>Roemer v. Maryland Bd. of Public Works</u>, 426 U.S. 736, 746 (1976)). The Court upheld the statute against a facial challenge under a <u>Lemon</u> analysis.

In <u>Agostini v. Felton</u>, 521 U.S. 203 (1997), the court distilled its explanation to this:

> A number of our Establishment Clause cases have found that the criteria used for identifying beneficiaries are relevant in a second respect, apart from enabling a court to evaluate whether the program subsidizes religion. Specifically, the criteria might themselves have the effect of advancing religion by creating a financial incentive to undertake religious indoctrination. This incentive is not present, however, where the aid is allocated on the basis of neutral, secular

criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis. Under such circumstances, the aid is less likely to have the effect of advancing religion.

521 U.S. at 230-231 (citations omitted).

If the City's transfer of the Family Dollar parcel to St. Joseph's High School is part of a program that allocates benefits from the City "on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis," the transaction is considerably less likely to amount to an endorsement or advancement of religion.

b

The sequence of events makes it difficult to frame the issue. By the time the City's Common Council allocated the funds to acquire the Family Dollar parcel, St. Joseph's High School already had acquired the Medical Center land with plans to build a new high school and athletic facilities. If the $35 million project were already under way, it is more difficult for the objective, informed reasonable person to view the Family Dollar transaction as part of an ongoing program of encouraging development, as opposed to a simple below-market transfer of the sort that generally indicates advancement or endorsement of religion.

The City reported at the injunction hearing that communications with St. Joseph's High School had occurred before the high school decided to go ahead with the project. Counsel explained at the hearing,

> Saint Joseph's High School had determined that it needed that parcel in order to be able to develop its athletic fields completely. Otherwise, this particular [Family Dollar] parcel extends to the sideline, the south sideline of the field. Saint Joseph's High School tried to acquire this property but was unable . . . to negotiate with the owners. The City offered its assistance and its ability to negotiate and indicated that, in fact, it would make an attempt to acquire this property to be able to complete – and my understanding is that, based on those representations and based on oral understandings that the City, in fact, had developed with the owners of this particular property, that the high school felt comfortable acquiring and starting its own process.
>
> Obviously, until there's an appropriation through the South Bend Common Council and until there are formal documents in writing with respect to the acquisition of the property, that, in fact, can't happen, but the high school felt, I understand, comfortable that, in fact, it could move forward based on the City's representations that, in fact, it would be able to assist to complete the parcel, complete the athletic field.

The court doesn't question that those discussions took place; the difficult issue is whether the objective, informed, reasonable person would know of those things when evaluating whether the Family Dollar transaction advances or endorses religion. The minutes of the several Common Council meetings in which the transaction was discussed contain no mention of any earlier representations to St. Joseph's High School. No member of the Common Council, representative of the City, or speaker from the floor made any reference to the decision as keeping the City's word or breaking the City's promise to the high school.

Courts have struggled to decide just how informed the hypothetical objective reasonable person is deemed to be for purposes of the <u>Lemon</u> test. <u>Milwaukee Deputy Sheriffs' Ass'n v. Clarke</u>, 588 F.3d 523, 528 (7th Cir. 2009) ("The objective 'reasonable person' in this test is presumed to be "'informed . . . [and] familiar with the history of the government practice at issue.'") (*quoting* <u>Vasquez v. L.A. County</u>, 487 F.3d 1246, 1256 (9th Cir.2007)); *accord* <u>Mercier v. Fraternal Order of Eagles</u>, 395 F.3d 693, 705 (7th Cir. 2005) ("[O]ur focus is not on the intent of the City, but on whether a reasonable person, apprised of the circumstances surrounding the sale, would conclude that the sale amounted to an endorsement of religion."); *see generally* <u>Freedom from Religion Foundation, Inc. v. City of Marshfield, Wis.</u>, 203 F.3d 487, 495 n.2 (7th Cir. 2000) (collecting cases). If the proper examination focuses on the time of the City's decision — the Common Council's adoption of the ordinance allocating funds to buy the Family Dollar parcel — the objective reasonable person might need to have had omniscience. Still, it isn't clear that the passage of the ordinance is the proper time frame to consider: the City hasn't yet made the transfer to St. Joseph's High School, and the pre-acquisition representations are known now. So, rather than dwell on what the objective and informed reasonable person knew and when she knew it, the court assumes that the objective and informed reasonable person knows that the City's acquisition and contemplated transfer of the Family Dollar parcel is a follow-up to representations made to induce St. Joseph's High School to develop the property the Medical Center was vacating.

c

Even when viewing the proposed Family Dollar transfer as an inducement to a \$35 million development project in downtown South Bend, the City's action must be part of a larger program that allocates benefits on the basis of neutral, secular criteria that neither favor nor disfavor religion and make benefits available to all on a nondiscriminatory basis. Agostini v. Felton, 521 U.S. at 231. As non-sectarian as the City's goal of redevelopment is, it can't be said to have a "program" within the contemplation of Bowen v. Kendrick, 487 U.S. 589, Zobrest v. Catalina Foothills School District, 509 U.S. 1, or Agostini v. Felton, 521 U.S. 203.

At best, the City has a pattern of development that is neutral with respect to religion. Each transaction involves unique circumstances, a unique City action, and requires separate negotiations with the development partner. Most importantly, each transaction requires separate legislative approval, which converts even the most neutrally intentioned, long-range development plan into a series of individual actions by the currently-empowered legislators. A program's specific neutral criteria might suffice to defeat a finding of endorsement or advancement in a given case, *see, e.g.,* American Atheists, Inc. v. City of Detroit Downtown Dev. Auth., 567 F.3d 278 (6th Cir. 2009), but the City hasn't identified any specific, neutral criteria that govern these separate legislative decisions. It appears that the City considers the development potential of each opportunity on its own merits, and its decision-makers (who split 5-4 on the Family Dollar

transaction) make their own independent judgments. The City has no neutral program with specific and neutral criteria that make benefits available to all. The Family Dollar transaction cannot be viewed as a piece of a neutral redevelopment program.

4

This returns the court to the central issue for resolution. Action that has the primary or principal effect of promoting one religion over other religions or promoting religion over non-religion violates the second prong of the <u>Lemon</u> test. *See* <u>Freedom from Religion Foundation, Inc. v. City of Marshfield, Wis.</u>, 203 F.3d 487, 493 (7th Cir. 2000) (*citing* <u>Lynch v. Donnelly</u>, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)).

The proposed Family Dollar transaction has the appearance of putting adherents and nonadherents on different footing, which would lead an objective, well-informed, reasonable observer to think the City is endorsing St. Joseph's High School, the local Catholic community, or the Diocese that operates the high school. City treasury funds are, by their nature, limited, and a significant expenditure in favor of one project denies those funds to other projects, or, at least, amounts to a decision not to retain those funds in the City treasury. To the adherents, namely the supporters of St. Joseph's High School and the Diocese, this below-market transfer of real estate could be considered an endorsement of their undertaking to rebuild and expand the high school. A well-informed and

33

reasonable nonadherent would see the below-market transfer as a direct endorsement of a particular religion.

The City's actual intent is likely to endorse the high school's construction project, not the high school itself or the religion with which the high school is affiliated. As already discussed, though, the endorsement test looks to the perception of the well-informed observer, not the governmental actor. Furthermore, since the development project as a whole appears to not be contingent at all on the donation, the action will appear to such an observer as more of an endorsement to aid a religious school after the fact than an enticement to bring about redevelopment. In County of Allegheny v. ACLU, 492 U.S. 573 (1989), the Supreme Court wrote that Justice O'Connor's Lynch concurrence "squarely rejects any notion that this Court will tolerate some government endorsement of religion. Rather, the concurrence recognizes any endorsement of religion as 'invalid[.]'" 492 U.S. at 595. In sum,

> [w]hatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion), it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.

Id. (internal citations and quotations omitted). The objective, well-informed, reasonable observer would see no delineation between supporting the high school's building project and supporting the religious school itself.

The City's proposed conveyance of the Family Dollar parcel to St. Joseph's High School would violate the Establishment Clause of the First Amendment and, so, must be enjoined.

III

The plaintiffs also contend that the proposed transfer of the Family Dollar parcel to St. Joseph's High School would violate two provisions of the Indiana Constitution. Because the court has found that injunctive relief is appropriate under federal Establishment Clause, and because a federal district court has considerably less expertise with the Indiana Constitution than do Indiana courts, the court declines to address those claims.

IV

The City of South Bend plans to transfer land to St. Joseph's High School in exchange for something below what the market would bear. The difference between the market value and what St. Joseph's High School is giving up is a benefit from a government to a religious institution. The Establishment Clause prohibits governments from providing benefits that a well-informed reasonable person would see as advancing or endorsing religion. The school voucher cases don't allow the transfer to the high school because there is no one such as a student's parent making the decision to give the benefits to the school. The cases that allow benefits to go to religious institutions as part of a neutral and

independent program don't allow the transfer because the City has no specific and neutral criteria that make benefits such as these available to everyone. The proposed transfer violates the Establishment Clause.

For these reasons, the court declares that the City threatens to violate the plaintiffs' rights under the Establishment Clause, and enjoins the City of South Bend from transferring the property at 717 E. LaSalle Ave. to Northeast Neighborhood Revitalization, Inc. for transfer to St. Joseph's High School.

SO ORDERED.

ENTERED:   September 7, 2011

 /s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Judge
United States District Court